UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------
JIN DONG WANG, FENG MEI LI and
DAN SHI,

                              Plaintiff,

                v.

LW RESTAURANT, INC. d/b/a A TASTE OF
SHANGHAI RESTAURANT, JD RESTAURANT
(NY), INC. d/b/a A TASTE OF SHANGHAI
RESTAURANT, DONG SHU SHAO, YI ZHENG
a/k/a AMY CHU, JUNHENG SHEN and CINDY
JIANG,

                              Defendants.
------------------------------------------------------------

**MEMORANDUM & ORDER**
12-CV-5008 (MKB)

MARGO K. BRODIE, United States District Judge:

        Plaintiffs Jin Dong Wang and Feng Mei Li commenced this action against Defendants

LW Restaurant, Inc., doing business as A Taste of Shanghai Restaurant, JD Restaurant (NY),

Inc., doing business as A Taste of Shanghai Restaurant, Dong Shu Shao, Yi Zheng, Junheng

Shen, and Cindy Jiang,[1] alleging overtime violations of the Fair Labor Standards Act, 29 U.S.C.

§§ 201 *et seq.* ("FLSA"), and overtime and spread-of-hours violations of New York Labor Law

§§ 650 *et seq.* ("NYLL") and regulations, 12 N.Y. Comp. Codes R. & Regs. § 146-1.4, 146-1.6.

Plaintiffs subsequently filed an Amended Complaint, (Docket Entry No. 19), adding Dan Shi as

a Plaintiff and adding allegations of violations of New York Labor Law's recordkeeping

requirements, NYLL § 195(1), and wage statement provision, NYLL § 195(3).  Discovery closed

---

        [1]  Dong Shu Shao was incorrectly identified in the Complaint as Dong Chu Shao and is
occasionally referred to as Shao Dong Chu.  Yi Zheng, also known as Amy Chu, was identified
in the Complaint as Amy Chu.  Cindy Jiang was identified in the Complaint as Jane Doe a/k/a
Cindy.  In each instance, the Court adopts the choice and spelling of the name as used by the
Defendant himself or herself.

on September 13, 2013.  Defendants now move for partial summary judgment seeking to dismiss all claims against Zheng, Shen and Jiang.  For the reasons set forth below, the Court denies Defendants' motion for partial summary judgment.

## I.  Background

### a.  The Restaurant and the Plaintiffs

The restaurant doing business as "A Taste of Shanghai" (the "Restaurant") is located at 39-07 Prince Street #1A, Flushing New York.  (Def. 56.1 ¶ 2; Pl. Counter 56.1 ¶ 2.)  It has been in business since July 2008.  (Decl. of Cindy Jiang in Support of Def. Mot. for Summary Judgment ("Jiang Decl.") ¶ 4.)  The Restaurant was co-owned by Defendants Dong Shu Shao, Junheng "Jason" Shen and Cindy Jiang, who held shares equal to a forty percent interest, thirty percent interest, and thirty percent interest, respectively.  (Decl. of Dong Shu Shao in Support of Def. Mot. for Summary Judgment ("Shao Decl.") ¶ 2; Decl. of Junheng Shen in Support of Def. Mot. for Summary Judgment ("Shen Decl.") ¶ 2; Jiang Decl. ¶ 2.)  According to Defendants, at some time during the course of the business operations, the three shareholders agreed that Shao would be primarily responsible for the daily operation and management of the Restaurant.  (Shao Decl. ¶ 4; Shen Decl. ¶ 5; Jiang Decl. ¶¶ 3, 5.)  Yi Zheng was hired by Shao and worked as a cashier from July 1, 2008 through June 15, 2013.  (Decl. of Yi Zheng in Support of Def. Mot. for Summary Judgment ("Zheng Decl.") ¶ 3; Def. 56.1 ¶ 34.)  Zheng and Shao were married on April 3, 2009 and divorced in January of 2013.  (Zheng Decl. ¶ 4; Def. 56.1 ¶ 34.)  Zheng never had an ownership interest in the Restaurant.  (Zheng Decl. ¶ 3; Def. 56.1 ¶ 3.)

Plaintiffs, Jin Dong Wang, Feng Mei Li and Dan Shi, are three former Restaurant employees.

Wang was hired to work at the Restaurant at the direction of Shao. (Def. 56.1 ¶ 5; Pl. Counter 56.1 ¶ 5; Wang Dep. 8:18–9:3.) Wang's employment began on or about March 22, 2009, and continued through September 21, 2012. (Li and Wang Resp. to Def. First Interrog., dated Mar. 19, 2013 ("Pl. First Interrog. Resp."), annexed to Decl. of William Chaung ("Chuang Decl.") as Ex. E, ¶ 3.) Wang worked in the Restaurant's kitchen. (Def. 56.1 ¶ 9; Pl. Counter 56.1 ¶ 9.) From March 22, 2009 through November 2010, Wang worked as a food preparer. (Pl. First Interrog. Resp. ¶ 3.) From November 2010 through September 2012, Wang was a frying chef, or junior chef. (Pl. First Interrog. Resp. ¶ 3; Aff. of Jin Dong Wang in Opp'n to Def. Mot. for Summary Judgment ("Wang Aff.") ¶ 3.) On September 21, 2012, Wang quit his job at the restaurant because Zheng "gave him a hard time," frequently returning dishes Wang had prepared as unacceptable. (Def. 56.1 ¶¶ 5, 16; Pl. Counter 56.1 ¶¶ 5, 16.)

Li worked at the Restaurant as a Senior Chef from July 1, 2008 through August 5, 2012. (Aff. of Feng Mei Li in Opp'n to Def. Mot. for Summary Judgment ("Li Aff.") ¶ 3; Pl. Resp. to Def. Second Set of Interrogs. ("Pl. Second Interrog. Resp."), annexed to Chuang Decl. as Ex. I, ¶ 7.) Li spent the majority of her time in the kitchen and was often unaware of how the front of the Restaurant, where customers entered and dined, was being run. (Li Aff. ¶ 7; Def. 56.1 ¶ 9; Pl. Counter 56.1 ¶ 9.) In August 2012, Shao terminated Li. (Def. 56.1 ¶¶ 4, 17; Pl. Counter 56.1 ¶¶ 4, 17.) Li had requested approximately four to six weeks' leave to handle a personal matter, and when she returned to work Shao informed her that they had hired someone to replace her. (Dep. of Feng Mei Li ("Li Dep."), annexed to Chuang Decl. as Ex. A, 25:19–26:4.)

Dan Shi worked at the Restaurant as a waiter, and occasionally as a cashier. (Def. 56.1 ¶¶ 6, 9; Pl. Counter 56.1 ¶¶ 6, 9.) Shi was also eventually appointed "overseer" of the wait staff, a position that appears to be similar to supervisor or team leader. (Aff. of Dan Shi in Opp'n to

Def. Mot. for Summary Judgment, ("Shi Aff.") ¶¶ 29–30; *see also* Zheng Decl. ¶ 11 ("Shi supervised waiters and waitresses.").)  Shi maintained employment at the Restaurant from March 15, 2009, to June or July 2011,[2] and from September 15, 2012 through November 3, 2012.  (Shi Aff. ¶ 3; Deposition of Dan Shi ("Shi Dep."), annexed to Chuang Decl. as Ex. C, 59:17–23.) When he was first hired in March 2009, Shi was interviewed at the recommendation of Zheng. Zheng knew that Shi had been looking for employment so she referred him to Shao, who hired Shi after interviewing him.  (Shao Decl. ¶ 7; Zheng Decl. ¶ 7; Shi Dep. 120:16–24.)  Shi voluntarily stopped working at the Restaurant in 2011.  (Def. 56.1 ¶ 6; Pl. Counter 56.1 ¶ 6.)  In September 2012, Shi returned to work after Shao asked him to do so.  (Def. 56.1 ¶ 7; Pl. Counter 56.1 ¶ 7.)  Shi again voluntarily stopped working for the Restaurant in November of 2012.  (Def. 56.1 ¶ 7; Pl. Counter 56.1 ¶ 7.)  He sought to return later in 2012, but was not rehired.  (Pl. Second Interrog. Resp. ¶ 7; Zheng Decl. ¶ 8.)

### b. The Individual Defendants and their responsibilities

#### i. Shao

At all relevant times, Dong Shu Shao owned a forty percent ownership interest in the Restaurant.  (Def. 56.1 ¶ 3; Shao Decl. ¶ 2.)  After deciding to open a restaurant, Shao and the other shareholders, Shen and Jiang, agreed that he would act as the general manager of the Restaurant and oversee its day-to-day operations.  (Shao Decl. ¶ 4; Jiang Decl. ¶¶ 3, 5; Shen Decl. ¶ 5)  Shao "wanted to be [his] own boss, and [] did not want to have [his] authority split with [] Jiang or [] Shen."  (Shao Decl. ¶ 4.)  Shao identified the location for the Restaurant and negotiated a lease for the Restaurant's premises with the landlord.  (Shao Decl. ¶ 4.)

---

[2]  Shi's affidavit states that he ceased working in July 2011, (Shi Aff. ¶ 3), but his deposition testimony indicates he ended work in June 2011, (Shi Dep. 59:17–23).

Shao was the face of the Restaurant's management for the employees. He was present at the Restaurant on a day-to-day basis. (Shao Decl. ¶ 5; *see also* Li Dep. 20:17–20.) Shao wanted the day-to-day operation and management left to his discretion because he did not want his authority over the employees to be questioned. (Shao Decl. ¶ 12.) Shao typically announced salary determinations, terminations, and other final decisions regarding employment matters. (Def. 56.1 ¶¶ 13, 19, 24; Pl. Counter 56.1 ¶¶ 13, 19, 24.) He was the only person who visibly hired employees for the Restaurant. (Def. 56.1 ¶ 14; Pl. Counter 56.1 ¶ 14.) According to Shao, he was the only person who had the authority to hire or fire employees. (Shao Decl. ¶ 6.) It is undisputed that Shao hired each of the Plaintiffs, and that Plaintiffs have no knowledge as to whether anyone other than Shao hired employees. (Def. 56.1 ¶¶ 14, 16–17; Pl. Counter 56.1 ¶¶ 14, 16–17.) The parties also agree that Shao terminated Li, (Def. 56.1 ¶¶ 4, 17; Pl. Counter 56.1 ¶¶ 4, 17), and refused to re-hire Shi when he sought his former position at the Restaurant at the end of 2012, (Zheng Decl. ¶ 8; Pl. Second Interrog. Resp. ¶ 7).

Plaintiffs received their pay directly from Shao, though the waiters were permitted to divide tips amongst themselves. (Def. 56.1 ¶ 21; Pl. Counter 56.1 ¶ 21.) Shao paid Plaintiffs' wages in cash on a biweekly basis. (Shao Decl. ¶ 9; Pl. Resp. to Request for Admissions ("Pl. RFA Resp."), annexed to Chuang Decl. as Ex. K, ¶¶ 4–8, 11–16, 18, 23.) Wait staff would pool all tips each evening and divide them amongst themselves at the end of the day; Shao was not involved in distributing tips. (Shi Dep. 56:15–24.) According to Defendants, Shao determined how much to pay each employee, which varied from week to week based on hours worked. (Shao Decl. ¶ 8.) Shao made his payment decision "using [his] own understanding of the wage and hour laws." (Shao Decl. ¶ 8.) Employees would typically speak with Shao, not Shen or

Jiang, if they wanted a pay raise. (Shao Decl. ¶ 8.) For example, Shao gave Li a pay raise. (Def. 56.1 ¶ 25; Pl. Counter 56.1 ¶ 25.)

Shao usually acted as the primary point of contact for Plaintiffs regarding their work schedules. (Def. 56.1 ¶ 22; Pl. Counter 56.1 ¶ 22.) Plaintiffs spoke with Shao regarding break time, and typically consulted with Shao when they needed vacation time or days off. (Def. 56.1 ¶ 10; Pl. Counter 56.1 ¶ 10.) When Li needed leave or requested vacation time, she directed her requests to Shao. (Def. 56.1 ¶ 25; Pl. Counter 56.1 ¶ 25.) The parties disagree — even amongst themselves — as to whether Shao was the sole point of contact on these matters. Shao states that he was the only person to set work schedules, and states that employees were required to ask him to change work schedules. (Shao Decl. ¶ 11.) If Shi, a waiter, had questions about when he was scheduled to work, Shao referred him to the schedule posted on the wall in the Restaurant. (Shi Aff. ¶ 7; Pl. Counter 56.1 ¶ 22.) According to Zheng, Shi set the shift schedule for waiters and waitresses with Shao's approval.[3] (Zheng Decl. ¶ 5.) As discussed below, Plaintiffs have identified additional instances where requests for shift changes and days off were directed to Defendants other than Shao.

Shao was a direct supervisor to kitchen staff. (Def. 56.1 ¶ 26; Pl. Counter 56.1 ¶ 26.) According to Wang, Shao, "the boss," "was the No. 1 guy" for the kitchen staff. (Wang Dep. 63:21–64:2.) Shao checked dishes for quality, ensuring that they were up to the standards of the Restaurant before they were served to customers. (Li Aff. ¶ 10.) According to Plaintiffs, Shao was also one of the direct supervisors of the wait staff. (Shi Aff. ¶ 13.)

---

[3] Shi states that he made these schedules at Zheng's direction, (Shi Aff. ¶ 14; Shi Resp. to Def. First Interrog., dated May 31, 2013 ("Shi First Interrog. Resp."), annexed to Chuang Decl. as Ex. F, ¶ 6(b)), and that Jiang prepared a duty schedule for the wait staff, (Shi Aff. ¶¶ 9, 34).

According to Defendants, the only employment records maintained by the Restaurant were records of payments made to the employees, kept by Shao.  (Def. 56.1 ¶ 11; Shao Decl. ¶ 10.)  Shao maintained all of these records himself.  (Def. 56.1 ¶ 11; Shao Decl. ¶ 10.)  Prior to the commencement of this lawsuit, Shao did not keep records of hours worked by each employee — Defendants assert that no one in the Restaurant did.  (Shao Decl. ¶ 10.)

### ii. Zheng

Zheng, known to Plaintiffs as Amy Chu, never had an ownership interest in the Restaurant.  (Zheng Decl. ¶ 3; Def. 56.1 ¶ 3.)  Shao hired Zheng as a cashier on July 1, 2008, and fired her on June 15, 2013.  (Zheng Decl. ¶ 3; Def. 56.1 ¶ 34.)  Zheng and Shao were married on April 3, 2009, and divorced in January 2013.  (Zheng Decl. ¶ 4; Def. 56.1 ¶ 34.)  Zheng was known as "Lady Boss" to Plaintiffs and to customers.  (Li Aff. ¶ 8; Wang Aff. ¶ 5; Zheng Decl. ¶ 6.)  Zheng states that this is a term of politeness in Chinese culture, and that she was called "Lady Boss" even before she was married to Shao.  (Zheng Decl. ¶ 6.)

Plaintiffs state that Zheng held herself out as a "boss" in the Restaurant.  (Wang Aff. ¶ 6.) According to Plaintiffs, Zheng exercised the power to fire employees.  In 2010, Zheng terminated individuals who may have later commenced a separate legal action against the Restaurant that year.[4]  (Pl. First Interrog. Resp. ¶ 6(b); Pl. Second Interrog. Resp. ¶ 7.)  Zheng also recommended Shi to Shao, for hire, three times: once in 2009, when Shi was first hired, and twice in 2012 — Shi was hired the second time but not the third.  (Shao Decl. ¶ 7.)  Shi describes the hiring process as follows:  "[Zheng] gave me a call and asked me whether or not I would like

---

[4]  Shi also attested to similar information in his affidavit.  (Shi Aff. ¶ 37.)  Defendants have requested the Court disregard this affidavit because it conflicts with other testimony provided by Shi.  (Def. Reply Mem. 2–4.)  The Court addresses this request in Part II.c. of this Memorandum and Order.

to work at the restaurant and I said yes. Then she told me that I should meet with Mr. Shao to have an interview with Mr. Shao and that was what happened." (Shi Dep. 120:19–24.) Shao then offered Shi employment as a waiter. (Def. 56.1 ¶ 6; Pl. Counter 56.1 ¶ 6.)

According to Plaintiffs, although Zheng primarily worked as a cashier in the dining area of the Restaurant and thus mainly interacted with the wait staff, she also supervised the kitchen staff. (Li Aff. ¶ 8; Shi Aff. ¶ 13.) Zheng directed Shi as to his duties as a waiter, and trained Shi as to how to serve customers. (Shi Aff. ¶ 10–12.) When Shi worked at the cash register, he acted under the direction of Zheng. (Shi Aff. ¶¶ 10–12; Shi Dep. 72:10–24; Pl. Counter 56.1 ¶ 9.) Shi's shift schedule was posted on the wall behind the cash register. (Shi Aff. ¶ 7.) According to Shi, every six months, Zheng would require a waiter to set a new work schedule. (Shi Aff. ¶ 14.) Shi asked Zheng for days off on approximately three occasions, which she granted. (Shi Aff. ¶ 15.) As for the kitchen staff, Zheng would ensure that dishes were prepared to the standards of the Restaurant before they were served to customers. (Li Aff. ¶ 10; Wang Aff. ¶ 7; Deposition of Jin Dong Wang ("Wang Dep."), annexed to Chaun Decl. as Ex. B, 63:9–23.) Zheng occasionally returned dishes to Wang because she determined they were inadequate. (Wang Aff. ¶ 8.) Eventually, Wang quit his job at the restaurant because Zheng "gave him a hard time" by frequently rejecting dishes Wang had prepared. (Def. 56.1 ¶¶ 5, 16; Pl. Counter 56.1 ¶¶ 5, 16.)

Zheng states that her primary responsibilities were acting as cashier, and occasionally waiting tables. (Zheng Decl. ¶ 3.) She did not have the power to hire and fire employees, because, by her explanation, if she had the power to do so, she "would not have been fired by [] Shao." (Zheng Decl. ¶¶ 5, 7.) At most, she referred friends like Shi to Shao for interviews. (Zheng Decl. ¶ 7.) Defendants state that it is common in the industry for employees to

recommend friends, like Zheng recommended Shi. (Shao Decl. ¶ 6.) Zheng disputes that she

ever supervised any of Plaintiffs. (Zheng Decl. ¶¶ 10, 11.) According to Zheng, Shi supervised

and set work schedules for wait staff. (Zheng Decl. ¶ 5.) Zheng did not maintain any Restaurant

records of any kind. (Zheng Decl. ¶ 12.) Zheng never paid employees, (Zheng Decl. ¶ 13; Pl.

Counter 56.1 ¶ 20), and claims she had no authority to set wages, hours, or to determine how

salaries were paid, (Zheng Decl. ¶ 13).

### iii. Shen

Shen, also referred to as "Jason," owned at all relevant times a thirty percent ownership

interest in the Restaurant. (Shen Decl. ¶ 2; Def. 56.1 ¶ 3.) Shen holds the Restaurant's liquor

license in his name, and is the Chief Executive Officer of the Restaurant. (Shen Decl. ¶ 6.) Shen

installed and operated the Restaurant's electronic "Point of Sale system" ("POS system"), which

kept sales reports of the food and drinks prepared and sold each day.[5] (Shao Decl. ¶ 15.) Each

evening, Shen would arrive at the Restaurant to print the day's sales reports. (Shen Decl. ¶ 7;

Shao Decl. ¶ 15; Def. 56.1 ¶ 29; *see also* Li Aff. ¶ 11; Wang Aff. ¶ 11.) He would "get[] money

from the cash register at the end of the day, [and do] something on the computer." (Def. 56.1

¶ 31; Pl. Counter 56.1 ¶ 31.) On Thursdays, Shen worked at the Restaurant as a cashier from

approximately 7:00 PM to closing. (Def. 56.1 ¶ 30; Pl. Counter 56.1 ¶ 30.) Both parties agree

that Shen did not act as a direct supervisor of Wang, Li, or other kitchen staff. (Def. 56.1 ¶¶ 31,

32; Pl. Counter 56.1 ¶¶ 31, 32.) Shen never gave Li a work schedule or otherwise told her what

to do. (Li Dep. 46:3–46:7.) However, according to Plaintiffs, Shen would taste the food and

would suggest improvements to the kitchen staff. (Shi Aff. ¶ 20.) Shen periodically ate at the

---

[5] Plaintiffs are unaware of what records were maintained in the POS system. (Def. 56.1
¶ 12; Pl. Counter 56.1 ¶ 12.) Defendants state that it was not used to maintain employment
records. (Shen Decl. ¶ 7; Def. 56.1 ¶ 12.)

Restaurant, as a patron, (Def. 56.1 ¶ 31; Pl. Counter 56.1 ¶ 31), and occasionally brought deliveries to the kitchen, (Li Aff. ¶ 12; Wang Aff. ¶ 12; Shen Decl. ¶ 13; Shao Decl. ¶ 17).

Plaintiffs assert that Shen was one of the bosses of the Restaurant. (Li Dep. 45:19–46:2; Shi Dep. 26:5–11.) According to Plaintiffs, Shen implemented rules for the wait staff to follow. (Shi Aff. ¶ 18; Shi First Interrog. Resp. ¶ 6(b); Shi Supp. Resp. to Def. First Interrog., dated June 13, 2013 ("Shi Supp. Resp."), annexed to Chuang Decl. as Ex. G, ¶ 6(b).) Shi asserts that initially, Shen and Shao instructed Shi to waive taxes for certain customers, in order to attract business for the restaurant. (Shi Dep. 26:2–27:20.) On at least one occasion, Shen directed the wait staff to include sales tax for all orders — Shen was aware of a custom in Chinese restaurants to exclude sales tax if a customer was a frequent patron or friend, and did not want the wait staff to follow such practices. (Shi Aff. ¶ 18.) As part of his review of the POS System, Shen would ensure that all orders included sales tax, pursuant to his instructions. (Shi Aff. ¶ 19; Shi First Interrog. Resp. ¶ 6(b); Shi Supp. Resp. ¶ 6(b).) If an order showed that sales tax had been excluded on an order, Shen would "locate the [responsible] individual and chastise them for failing to follow his direction." (Shi Aff. ¶ 19.) Shi states that Shen threatened to fire the staff if they did not follow his directions. (Shi Aff. ¶ 21; Shi Dep. 78:18–24.) Shen also rescheduled waiter's shifts and could grant days off. (Shi Supp. Resp. ¶ 6(b).) He switched Shi's schedule with that of another employee, Zhu, when Zhu spoke to Shen regarding a scheduling conflict — though it was Zhu who informed Shi of the switch, and Shen did not directly inform Shi until the following day. (Shi Aff. ¶ 22; Shi Dep. 15:15–17:8; Shi Supp. Resp. ¶ 6(b).)

According to Plaintiffs, Shen was also more generally involved in making improvements to the staff's performance and the overall business of the Restaurant. Shen commented on the wait staff's performance and proposed better service techniques. (Shi Aff. ¶ 18; Shi Dep.

111:6–25.)  Shen also attended some all-employee meetings, and discussed how to improve the

Restaurant's business.  (Wang Dep. 63:14–19.)

Defendants argue that Shen is less involved in the operations of the Restaurant, in part

because he has a day job which requires his attendance Monday through Friday for

approximately eight hours each day.  (Shen Decl. ¶ 3; *see also* Shao Decl. ¶ 4.)  Shen denies that

he ever gave orders, threatened to fire employees, or that he had the authority to supervise

employees.  (Shen Decl. ¶¶ 9–10.)  Shao states if Shen had threatened to fire an employee, "my

employees would have told me right away" and Shao would have asked him to stop.  (Shao Decl.

¶ 16.)  Shen denies that he ever changed any employee's work schedule, and states that he did

not have the authority to do so.  (Shen Decl. ¶ 10; *see also* Shao Decl. ¶ 11 ("No one else had the

right to change the hours and work schedule."))  He brought deliveries to the Restaurant only at

the request of Shao, who did not have a car and could not transport heavy supplies himself.

(Shen Decl. ¶ 13; Shao Decl. ¶ 17.)  According to Defendants, Shen did not keep records on how

many hours the employees worked or how much employees were paid.  (Shen Decl. ¶ 8.)  Shen

never paid employees himself.  (Shen Decl. ¶ 12; *see also* Pl. Counter 56.1 ¶¶ 20, 21.)

### iv.   Jiang

At all relevant times, Jiang owned a thirty percent ownership interest in the Restaurant.

(Jiang Decl. ¶ 2; Def. 56.1¶ 3.)  Prior to her involvement with A Taste of Shanghai, Jiang had

previously owned and managed a different restaurant.  (Jiang Decl. ¶ 3; Shao Decl. ¶ 4.)  Though

Jiang, Shao and Shen agreed that Shao would be primarily responsible for the day-to-day

operations of the company, (Jiang Decl. ¶¶ 3, 5; Shao Decl. ¶ 4), when the Restaurant first

opened, Jiang was there occasionally.  (*See* Shao Decl. ¶ 13.)  Defendants contend that Jiang was

the only person associated with the Restaurant who had a food safety certificate as required by

City Health Department inspectors, which necessitated her presence onsite during health inspections. (Jiang Decl. ¶ 4; Shao Decl. ¶ 13.)

Jiang was generally responsible for issues related to Health Department inspections, including instructing Plaintiffs as to what needed to be done to ensure the Restaurant passed each health inspection. (Li Dep. 62:16–63:2.) On one particular occasion, Jiang called an all-employee meeting after a sanitation inspection, and instructed employees on how to properly maintain the cleanliness of the restaurant. (Shi Aff. ¶¶ 32–33; Shao Decl. ¶ 13.) Jiang directed Li, and other employees, to keep the kitchen stations clean, particularly after Health Department inspections. (Li Dep. 63:3–64:15; *see* Jiang Decl. ¶ 4 ("I also told [Shao and the employees] what the city sanitation rules required so they would not have issues in the future.").)

According to Plaintiffs, Jiang took part in decisions regarding supervisors for the kitchen staff and wait staff, and delegated or assigned certain responsibilities to Shi. (Shi Aff. ¶ 27–31; Shi Dep. 76:8–25, 78:2–15, 142:23–143:2.) Jiang told Shi that if anyone disobeyed Shi, who was appointed "overseer" of the wait staff, she would fire them. (Shi Aff. ¶ 31; Shi Dep. 78:2–15.) Shi asserts that she also set rules on clean-up and sanitation. (Shi First Interrog. Resp. ¶ 6(b); Shi Supp. Resp. ¶ 6(b).) Jiang set up the menu and new dishes, and made a menu of weekly special dishes. (Shi Supp. Resp. ¶ 6(b).) She instructed employees not to take naps after lunch, and not to make telephone calls, (Shi Supp. Resp. ¶ 6(b); Shi Dep. 76:12–25), and posted a set of rules on the wall, (Shi First Interrog. Resp. ¶ 6(b)). Shi was also directed to follow a duty schedule, posted on a wall in the kitchen, which comprised of five categories of duties through which all of the wait staff rotated. (Shi Aff. ¶ 8.) Jiang prepared an updated duty schedule in mid-2010. (Shi Aff. ¶ 34.)

According to Plaintiffs, when Jiang was at the Restaurant, she would call all staff into a meeting, usually regarding Health Department issues or the quality of the dishes in the restaurant. (Li Dep. 46:8–46:15; *see also* Jiang Decl. ¶ 4.) In addition, Jiang would also convene all-employee meetings "whenever something major occurred that affected the [R]estaurant." (Shi Aff. ¶¶ 23–24; Li Dep. 31:18–24; *see also* Wang Dep. 50:15–23.) For example, the Restaurant was subject to a lawsuit in or around 2010, prior to the commencement of the instant action. (*See* Jiang Decl. ¶ 9; Shao Decl. ¶ 14.) The shareholders called a full-staff meeting in 2010, sometime after initiation of the lawsuit. (Shi Aff. ¶ 25.) At this meeting, Jiang required each employee to sign a document, written in English, which none of the Plaintiffs were able to read. (Shi Aff. ¶ 26; Li Dep. 59:1–60:15; Wang Dep. 73:6–74:14; Shi Dep. 134:4–134:25, 147:5–11.) The evidence before the Court suggests that this was a policy document.[6]

The parties do not dispute that Jiang was involved in implementing a formal policy for the Restaurant — but disagree as to her level of involvement.[7] According to Defendants, after the Restaurant was sued, Shao was informed that the Restaurant should have formal policies. (Jiang Decl ¶ 9; Shao Decl. ¶ 14.) Defendants state that Shao was unfamiliar with both the Internet and the English language, and he therefore asked Jiang to find a draft restaurant policy

---

[6] Wang testified that he asked Jiang about the contents of the document, and "[s]he told us that this document was about the behavior and discipline in the [R]estaurant, this document would not harm us and the document has nothing to do with a salaries [*sic*] and the working hours and it happened after the lawsuit had filed [*sic*] already." (Wang Dep. 74:4–11.) Furthermore, during his deposition, Shi was asked about "restaurant policy" and "restaurant policy paper," in response to which he testified that Jiang had directed all waiters to sign the policy. (Shi Dep. 134:10–25.)

[7] Defendants explain the substance of the Restaurant policy and assert that the policy, drafted by Jiang at the direction of Shao, was never implemented. (Jiang Decl. ¶ 9; Shao Decl. ¶ 14.) Defendants do not discuss whether a meeting was called to inform employees of the new policy, and do not address Plaintiff's allegations that Jiang required each employee to sign the policy document.

online and assist him in revising the draft policy for the Restaurant. (Jiang Decl. ¶ 9; Shao Decl. ¶ 14.) After Jiang found a policy, they made only minor changes to it, such as "changing the name of the restaurant." (Jiang Decl. ¶ 9; Shao Decl. ¶ 14.) Jiang presented this policy, or a different policy paper, to the employees and asked them to sign it. (Shi Dep. 134:4–25; 147:5–11.) According to Shao, "the policies were never instituted and never followed." (Shao Decl. ¶ 14.)

Defendants contend that Jiang had no real control over working conditions. For example, Jiang never paid wages to employees. (Jiang Decl. ¶ 6; Pl. Counter 56.1 ¶ 20.) Like Shen, Jiang was not at the Restaurant daily, because she had another job. (Def. 56.1 ¶ 33; Jiang Decl. ¶ 6.) Jiang contends that she did not have the authority to set wages or work schedules for the employees. (Jiang Decl. ¶ 5.) Jiang did "not know who all the employees were, much less how much they were paid or how many hours that they had worked." (Jiang Decl. ¶ 6.) She never hired or fired an employee, or recommended that anyone be hired or fired. (Shao Decl. ¶ 6.) According to Jiang, she "had no authority to hire and fire employees. I was not at the Restaurant often enough to know who was good or bad . . . . [Shao] was at the Restaurant all the time so only he made decisions like that." (Jiang Decl. ¶ 8.) Jiang admits that she called an all-employee meeting regarding a Health Department inspection, but states that this was because she understood English and Shao did not, and she had to explain what the City Health Department inspector told her needed to be done to pass the inspection. (Jiang Decl. ¶ 4; Shao Decl. ¶ 13.) Jiang never kept any records for the Restaurant. (Jiang Decl. ¶ 7.)

### v. All-employee meetings

According to Plaintiffs, Shao, Jiang, Shen and Zheng would sometimes convene meetings with all Restaurant employees, which included both kitchen staff and wait staff, to discuss

14

improvements to the Restaurant.  (Li Aff. ¶ 13; Wang Aff. ¶ 13; Wang Dep. 21:13–22:4,

51:2-17.)  They would discuss how to improve the dishes, how to better serve the customers, and

how to improve the overall operation of the restaurant.  (Li Aff. ¶ 14; Wang Aff. ¶ 14; Wang

Dep. 50:15–25.)  Salary was not discussed at the meetings, because "to discuss salary openly

would be a taboo."  (Wang Dep. 51:18–23; *see also* Shao Decl. ¶ 18.)

### vi.  Shareholder meetings

Shao, Shen and Jiang occasionally met at the Restaurant over dinner, for shareholders'

meetings.  (Shi Aff. ¶ 16–17; Shen Decl. ¶ 14.)  Plaintiffs were not privy to these conversations.

(*See* Shi Aff. ¶ 17.)  Plaintiffs contend that Shao, Shen and Jiang discussed employee wages and

working conditions during the shareholder meetings, because Zheng had told Shi that the

shareholders discussed many things at the meetings.  (Shi Aff. ¶ 17; Shi Dep. 118:6–119:21.)

Defendants state that the shareholders did not discuss "employee wages, work hours, work

schedules, work conditions, or maintaining records of employee salaries or hours" at the

meetings.  (Shen Decl. ¶ 14; Shao Decl. ¶ 19.)  Shao would simply "update" Shen and Jiang

"about the Restaurant."  (Shen Decl. ¶ 14.)  Zheng did not attend any of the shareholders'

meetings and she states that she was not aware of what Shao, Shen and Jiang actually discussed

at the shareholder meetings.  (Zheng Decl. ¶ 9; Shi Dep. 71:15–23; Def. 56.1 ¶ 35; Pl. Counter

56.1 ¶ 35.)

## II.  Discussion

### a.  Standard of Review

Summary judgment is proper only when, construing the evidence in the light most

favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant

is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Bronzini v. Classic*

*Sec., LLC*, 558 F. App'x 89, 89 (2d Cir. 2014); *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013); *Kwong v. Bloomberg*, 723 F.3d 160, 164–65 (2d Cir. 2013); *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 173–74 (2d Cir. 2012). The role of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Redd*, 678 F.3d at 174 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. The "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* The court's function is to decide "whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

### b.  Individual Defendants — FLSA and NYLL Claims

Defendants move to dismiss Plaintiffs' claims as to Zheng, Shen and Jiang on the basis that those Defendants are not "employers" of any of the Plaintiffs within the meaning of either the FLSA or NYLL.

### i.  FLSA

The FLSA creates liability for any "employer" who violates its terms. *See, e.g.*, 29 U.S.C. § 207(a)(1). Under the FLSA, an "employer" is defined broadly to include "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). The FLSA's definition of "employer" may apply to "an individual, partnership, association, corporation, business trust, legal representative, or any organized group of persons," 29 U.S.C. § 203(a), (d), and an individual may be employed by more than one employer, 29

C.F.R. § 791.2(a). "Because the statute defines employer in such broad terms, it offers little guidance on whether a given individual is or is not an employer." *Herman v. RSR Sec. Servs.*, 172 F.3d 132, 139 (2d Cir. 1999). In making that determination, a court should focus on "whether the alleged employer possessed the power to control the workers in question, with an eye to the 'economic reality' presented by the facts of each case." *Id.* (internal citations omitted).

Because the "economic reality" of a relationship drives the analysis as to whether it constitutes an employer-employee relationship for the purposes of FLSA, the determination must be made on a case-by-case basis in light of the totality of the circumstances, and cannot rest on technical concepts. *Irizarry v. Castimatidis*, 722 F.3d 99, 104 (2d Cir. 2013). In determining whether a defendant is an "employer," as defined in the statute, the Second Circuit has identified four factors to consider, including, "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." [8] *Id.* at 104 (internal quotation marks omitted) (quoting *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir. 1984)). These factors do not, however, "comprise a rigid rule for the identification of [a] FLSA employer," but rather provide a guideline "to ensure that the economic realities test mandated by the Supreme Court is sufficiently comprehensive and flexible to give

---

[8] The Second Circuit has noted that it has "identified different sets of relevant factors based on the factual challenges posed by particular cases" and that the four-factor test outlined above, originating from *Carter v. Dutchess Community College*, 735 F.2d 8 (2d Cir. 1984), is particularly "relevant to the question of whether a defendant is an 'employer,'" while separate factors, set forth in *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1058–59 (2d Cir. 1988), are "used to distinguish between independent contractors and employees" and "to assess whether an entity that lacked formal control nevertheless exercised functional control over a worker." *Irizarry v. Castimatidis*, 722 F.3d 99, 104–105 (2d Cir. 2013) (citations and internal quotations omitted).

proper effect to the broad language of the FLSA." *Id.* at 105 (quoting *Zheng v. Liberty Apparel Co.*, 355 F. 3d 61, 75–76 (2d Cir. 2003)) (internal quotation marks omitted). A district court is "free to consider any other factors it deems relevant to its assessment of the economic realities." *Zheng*, 355 F.3d at 71–72.

A plaintiff must demonstrate that an alleged employer-defendant has "some degree of individual involvement in a company in a manner that affects employment-related factors such as workplace conditions and operations, personnel, or compensation . . . ." *Irizarry*, 722 F.3d at 109. "A person exercises operational control over employees if his or her role within the company, and the decisions it entails, directly affect the nature or conditions of the employees' employment." *Id.* at 110; *see also Berrezueta v. Royal Crown Pastry Shop, Inc.*, No. 12-CV-4380, 2014 WL 3734489, at *9 (E.D.N.Y. July 28, 2014) ("Ownership, or a stake in a company, is insufficient to establish that an individual is an 'employer' without some involvement in the company's employment of the employees." (quoting *Irizarry*, 722 F.3d at 111) (internal quotation marks omitted)). The employer need not necessarily have "direct control over the plaintiff employees," and evidence indicating "an individual's authority over management, supervision, and oversight of a company's affairs in general is relevant to the totality of the circumstances in determining the individual's operational control of the company's employment of the plaintiff employees." *Irizarry*, 722 F.3d at 110 (alterations, citations and internal quotation marks omitted); *see also Copantitla v. Fiskardo Estiatorio, Inc.*, 788 F. Supp. 2d 253, 315–16 (S.D.N.Y. 2011) ("'[T]echnical concepts' such as [who determined rate of pay and who maintained employment records] do not constitute the test of who is an employer under the FLSA, and 'the overarching concern is whether the alleged employer possessed the power to control the workers in question.'" (internal citations omitted) (citing *Goldberg v. Whitaker House*

*Co-op., Inc.*, 366 U.S. 28, 33 (1961); *Herman*, 172 F.3d at 139)).  The Second Circuit has also

considered the relevance of a putative employer's level of potential power, or unexercised

authority, but has not yet reached the question of whether "unexercised authority is insufficient

to establish FLSA liability."  *Irizarry*, 722 F.3d at 111.

　　The question of whether an individual is an employer under the FLSA is a mixed

question of law and fact; "the existence and degree of each relevant factor lend[s] itself to factual

determinations.  Therefore, individual employer liability is rarely suitable for summary

judgment."  *Berrios v. Nicholas Zito Racing Stable, Inc.*, 849 F. Supp. 2d 372, 393 (E.D.N.Y.

2012) (citations omitted); *see also Franco v. Ideal Mortg. Bankers Ltd.*, No. 07-CV-3956, 2011

WL 317971, at *6 (E.D.N.Y. Jan. 28, 2011) (same).  *But cf. Spiteri v. Russo*, No. 12-CV-2780,

2013 WL 4806960, at *61 (E.D.N.Y. Sept. 7, 2013) (granting motion to dismiss in favor of

attorney defendants where, even accepting the plaintiff's factual allegations as true, the plaintiff

failed to demonstrate that the economic realities of the plaintiff's work for the attorney

defendants established an employer-employee relationship); *Bravo v. Eastpoint Int'l, Inc.*, No.

99-CV-9474, 2001 WL 314622, at *2 (S.D.N.Y. Mar. 30, 2001) (dismissing claim against

fashion designer Donna Karan as employer under the FLSA because plaintiffs only alleged her

status as the owner and chairperson of the employer company and failed to allege any facts

establishing her power to control the plaintiff workers or otherwise meet the economic realities

test).  The Court addresses Defendants' motion as to Zheng, Shen and Jiang individually.

### 1.  Zheng

　　As a cashier with no ownership in the Restaurant, Defendants contend Zheng had no

authority to determine payroll and had no involvement in recordkeeping.  (Zheng Decl.

¶¶ 11–13; Def. 56.1 ¶ 3.)  Zheng did not participate in shareholder meetings, and contends that

she did not know what, specifically, was discussed at such meetings. (Zheng Decl ¶ 9; Def. 56.1 ¶ 35; Pl. Counter 56.1 ¶ 35.) According to Zheng, she was only a cashier with no supervisory authority over Plaintiffs. (Zheng Decl. ¶ 11.) At most, she could make recommendations as to which employees should be hired or fired. (Zheng Decl. ¶¶ 5, 8; Shao Decl. ¶ 6.) However, according to Plaintiffs, Zheng fired employees herself, including Dabing, Mimi, and Zhang. (Pl. First. Interrog. Resp. ¶ 6(b); Pl. Second Interrog. Resp. ¶ 7). Plaintiffs' testimony also suggests that Zheng created work schedules for the wait staff, or directed Shi to do so. (Shi Aff. ¶ 14.) As for the kitchen staff, Plaintiffs' testimony illustrates that, in addition to her purported ability to fire employees, Zheng did direct the kitchen staff on how to improve the quality of food served at the Restaurant. (Li Aff. ¶10; Wang Aff. ¶ 7; Wang Dep. 63:9–23.)

Viewing the facts in the light most favorable to the non-moving parties, there are disputed issues that prevent the Court from deciding whether Zheng is an employer under the FLSA. As to the first *Carter* factor, the facts are disputed as to whether Zheng had the power to hire or fire Plaintiffs. Plaintiffs' testimony reveals that Zheng fired three or four other individuals who were employed at the Restaurant, though the testimony does not make clear in which position those individuals were employed, when they were fired, or elucidate any other details of the circumstance of those terminations. Zheng testified that her authority was more limited, and at most, she could make recommendations as to who should be hired or terminated. *See Copantitla*, 788 F. Supp. 2d at 310–11 (finding plaintiffs did not satisfy the first *Carter* factor by offering testimony that defendant sometimes made recommendations on hiring because ultimately, the employer was free to disregard such recommendations.) As to the second *Carter* factor, based on the evidence in the record, a reasonable jury could find that Zheng supervised and controlled at least the wait staff's "work schedules or conditions of employment." *Irizarry*,

722 F.3d at 105 (quoting *Carter*, 735 F.2d at 12). Though it appears from the record that Zheng did not "determine[] the rate and method of payment" or "maintain[] employment records" as required by the third and fourth *Carter* factors, these facts are not dispositive. Based on the foregoing, the Court cannot determine as a matter of law that Zheng was not an "employer" under the FLSA. Defendants' motion for summary judgment as to Plaintiffs' FLSA claims against Zheng is therefore denied.

### 2. Shen

Shen was the Chief Operating Officer of the Restaurant and one of the three shareholders. (Shen Decl. ¶ 2; Def. 56.1 ¶ 3.) The lease for the Restaurant's operating space and liquor license for the Restaurant are in Shen's name. (Shen Decl. ¶ 6; Def. Letter dated September 19, 2013, Docket Entry No. 33, at 2.) It is undisputed that Shen regularly collected accounts receivable and retrieved sales data from the POS system. Although Shen claims he was not involved in the business of the Restaurant, according to Plaintiffs, Shen involved himself in supervising the quality of their work and directing them as to their duties. (Shi Aff. ¶¶ 18–22; Wang Dep. 63:14–19; Shi Dep. 78:18–24.) By Plaintiffs' account, Shen gave the wait staff instructions on whether or not to include sales tax on orders, (Shi Dep. 26:2–27:20; Shi Aff. ¶ 19), directed the wait staff regarding treatment of the customers and quality of service in the Restaurant, changed waiters' shifts on at least one occasion, (Shi Aff ¶ 22; Shi Dep. 15:15–17:8), and was involved in all-employee meetings which included direction as to how the wait staff and kitchen staff could improve the Restaurant's business, (Shi Aff. ¶ 18; Wang Dep. 63:14–19; Wang Aff. ¶¶ 13–14; Li Aff. ¶¶13–14).

Defendants contend that Shen did not have the power to hire and fire employees, but according to Shi, Shen threatened to fire employees who did not follow his instructions. (Shi

Dep. 78:18–24; Shi Aff. ¶ 21.) Plaintiffs also recall that, at times, Shen rescheduled waiters'

shifts, (Shi Aff. ¶ 22; Shi Dep. 15:15–17:8), or implemented rules regarding break times and

naps at work, (Shi Suppl. Resp. ¶ 6(b)). He was also at the Restaurant regularly and seemed to

have some involvement in managing the volume of business in the Restaurant, which would

have a direct impact on the volume of work of the kitchen and wait staff. (Shi Aff. ¶ 18; Shi

Dep. 111:6–25; Wang Dep. 63:14–19.) Plaintiffs contend that Shen had the power to allot

vacation time, but Shen denies this. (Shen Decl. ¶¶10–11; Shao Decl. ¶11.)

Applying these facts to the *Carter* factors, there are disputed issues of fact that prevent

the Court from deciding whether Shen is an employer under the FLSA. As to the first *Carter*

factor, the facts are disputed as to whether Shen had the power to hire or fire Plaintiffs.

Plaintiffs' testimony suggests that Shen disciplined and, at least according to Shi, threatened to

fire employees, especially wait staff, while Shen testified that he had no such authority. As to

the second *Carter* factor, based on the evidence in the record, a reasonable jury could find that

Shen supervised and controlled Plaintiffs' "work schedules or conditions of employment,"

including wait staff work schedules, rules regarding break time, directions on serving customers,

and directions on how to prepare food.[9] *Irizarry*, 722 F.3d at 105 (quoting *Carter*, 735 F.2d at

12). Though it appears from the record that Shen did not "determine[] the rate and method of

---

[9] Some courts have found that suggestion-making alone is insufficient to show that an
individual exerts the sort of control that one would expect of a FLSA employer. *See Copantitla
v. Fiskardo Estiatorio, Inc.*, 788 F. Supp. 2d 253, 314 (S.D.N.Y 2011). However, directing
employees as to how to do their job is one of many relevant factors that may, when viewed in the
totality of the circumstances, be relevant to determining whether an individual is or is not an
employer. *See Chao v. Vidtape, Inc.*, 196 F. Supp. 2d 281, 290–91 (E.D.N.Y. 2002) (considering
whether a person "gave the employees orders or directions" in determining whether he was an
employer) *aff'd as modified*, 66 F. App'x 261 (2d Cir. 2003).

payment"[10] or "maintain[] employment records" as required by the third and fourth *Carter* factors, these technical factors are not dispositive on the issue of whether he is an employer. *See Copantitla*, 788 F. Supp. 2d at 315–16. The record demonstrates that Shen was involved in some of the operations of the Restaurant on a day-to-day basis, in spite of the shareholders' agreement to the contrary. Moreover, Shen's involvement in the Restaurant's finances and connection to the operations and regular functions of the Restaurant via shareholder meetings creates additional factual issues. *See Peng Bai v. Fu Xing Zhuo*, No. 13-CV-05790, 2014 WL 2645119, at *2 (E.D.N.Y. June 13, 2014) ("A corporate officer may be considered an employer if 'the individual has overall operational control of the corporation, possesses an ownership interest in it, controls significant functions of the business, or determines the employees' salaries and makes hiring decisions.'" (quoting *Ansoumana v. Gristede's Operating Corp.*, 255 F. Supp. 2d 184, 192–93 (S.D.N.Y.2003))). Based on the foregoing, the Court cannot determine as a matter of law that Shen was not an "employer" under the FLSA. Defendants' motion for summary judgment as to Plaintiffs' FLSA claims against Shen is therefore denied.

---

[10] Plaintiffs do not dispute that they each received their cash payments only from Shao, but argue that wages must have been discussed between the shareholders, including Shen, at shareholder meetings. (Shi Aff. ¶ 17; Shi Dep. 118:6–119:21.) Plaintiffs, in this regard, have not presented sworn statements or other admissible evidence of other people's experiences, but instead rely on their own hearsay statements about the experiences of others, which are inadmissible at the summary judgment stage. *See DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) ("[W]here a party relies on affidavits or deposition testimony to establish facts [on a motion for summary judgment], the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.'" (citing Fed. R. Civ. P. 56(c)(4) and Fed. R. Evid. 602)); *see also* Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.").

### 3. Jiang

For at least some period of time, Plaintiffs answered to Jiang as to Health Department inspection issues, including proper food preparation, cleanliness, and sanitation. (Li Dep. 61:16–64:15; Shi Aff. ¶¶ 32–33; Shi Supp. Resp. ¶ 6(b); Shao Decl. ¶ 13; Jiang Decl. ¶ 4.) On several occasions, Jiang communicated information and instructions to employees at all-staff meetings. (Shao Decl. ¶ 13; Jiang Decl. ¶ 4.) Jiang prepared a Restaurant policy, possibly in collaboration with Shao, (Jiang Decl. ¶ 9; Shao Decl. ¶ 14), and presented it, or another policy document, to employees for their signature, (Shi Dep. 134:4–25, 147:5–11; Li Dep. 59:1–60:15). Based on Plaintiffs' testimony, Jiang posted a duty schedule for the wait staff, (Shi Aff. ¶ 34), was responsible for setting the Restaurant's menu, and set other rules for the Restaurant, (Shi Supp. Resp. ¶ 6(b); Shi Dep. 76:12–25.). Jiang promoted or appointed "overseers," or supervisors, of both the wait staff and kitchen staff. (Shi Aff. ¶ 31; Shi Dep. 76:12–25, 78:2–15.) According to Shi, Jiang communicated to him that if the wait staff disobeyed him, the overseer, she could and would fire them.[11] (Shi Aff. ¶ 31.) Jiang contends her authority was more limited. (Jiang Decl. ¶¶ 6–8.)

Applying the *Carter* factors, it is undisputed that Jiang was responsible for some operations of the Restaurant, including conditions relevant to health inspections. However, "the existence and degree" of Jiang's power to hire and fire, her level of supervision and control, and her ability to determine the rate and method of payment cannot be determined based on the record before the Court and must be determined by a jury. *See Berrios*, 849 F. Supp. 2d at 393

---

[11] Plaintiffs also assert that Jiang must have had some involvement in setting the rate and method of payment because "many things" were discussed at shareholder meetings. As discussed in footnote 10, Plaintiffs have not presented admissible evidence to show that they are competent to testify as to what was discussed at shareholder meetings. *See DiStiso*, 691 F.3d at 230.

(finding that "the existence and degree of each relevant factor lend[s] itself to factual determinations," rendering "individual employer liability . . . rarely suitable for summary judgment"); *Moon v. Kwon*, 248 F. Supp. 2d 201, 236 (S.D.N.Y. 2002) ("Control may be restricted, or exercised only occasionally, without removing the employment relationship from the protections of the FLSA, since such limitations on control do not diminish the significance of its existence." (quoting *Herman*, 172 F.3d at 139 (internal quotation marks and alterations omitted)). "A corporate officer may be considered an employer if 'the individual has overall operational control of the corporation, possesses an ownership interest in it, controls significant functions of the business, or determines the employees' salaries and makes hiring decisions.'" *Peng Bai*, 2014 WL 2645119, at *2 (quoting *Ansoumana*, 255 F.Supp.2d at 192–93). The Court cannot determine as a matter of law that Jiang was not an "employer" under the FLSA. Defendants' motion for summary judgment as to Plaintiffs' FLSA claims against Jiang is therefore denied.

### ii. NYLL

The NYLL defines "employer" to include "any person . . . employing any individual in any occupation, industry, trade, business or service" or "any individual . . . acting as employer." NYLL §§ 190(3), 651(6); *see also Irizarry*, 722 F.3d at 117 (quoting NYLL §§ 190(3), 651(6)). The question of whether "the tests for 'employer' status are the same under the FLSA and the NYLL . . . has not been answered by the New York Court of Appeals." *Irizarry*, 722 F.3d at 117. District courts in this Circuit "have interpreted the definition of 'employer' under the New York Labor Law coextensively with the definition used by the FLSA." *Spicer v. Pier Sixty LLC*, 269 F.R.D. 321, 335 n.13 (S.D.N.Y. 2010) (quoting *Jiao v. Shi Ya Chen*, No. 03-CV-0165, 2007 WL 4944767, at *9 n.12 (S.D.N.Y. Mar. 30, 2007) (interpreting the definition of "employer"

under the New York Labor Law coextensively with the definition used by the FLSA because there is "general support for giving FLSA and the New York Labor Law consistent interpretations" (citation and internal quotation marks omitted))); *see also Sethi v. Narod*, 974 F. Supp. 2d 162, 188–89 (E.D.N.Y. 2013); *Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901, 940 (S.D.N.Y. 2013) (noting that "[c]ourts in this District have regularly applied the same tests to determine, under the FLSA and the NYLL, whether entities were joint employers" because "[t]he statutory standard for employer status under the NYLL is nearly identical to that of the FLSA" and that while "the New York Court of Appeals has not yet resolved whether the NYLL's standard for employer status is coextensive with the FLSA's . . . there is no case law to the contrary" (citations omitted)); *Cruz v. Rose Associates, LLC*, No. 13-CV-0112, 2013 WL 1387018, at *2 (S.D.N.Y. Apr. 5, 2013) (noting that the definitions of "employer" under the NYLL and the FLSA are coextensive (citing *Spicer*, 269 F.R.D. at 335 n.13)); *Chen v. St. Beat Sportswear, Inc.*, 364 F. Supp. 2d 269, 278 (E.D.N.Y. 2005) ("Courts hold that the New York Labor Law embodies the same standards for joint employment as the FLSA." (citation omitted)); *Topo v. Dhir*, No. 01-CV-10881, 2004 WL 527051, at *3 (S.D.N.Y. Mar. 16, 2004) (noting that there is "general support for giving FLSA and the New York Labor Law consistent interpretations"); *Ansoumana*, 255 F. Supp. 2d at 189 ("[B]ecause New York Labor Law and the FLSA embody similar standards . . . I will consider the federal law in deciding whether defendants were joint employers."); *Lopez v. Silverman*, 14 F. Supp. 2d 405, 411 n.4 (S.D.N.Y. 1998) (considering federal law only as to question of joint employment under federal and New York law)).

As set forth above with regard to the FLSA claims, issues of fact preclude the Court from determining as a matter of law whether Shen, Jiang and Zhao are employers. Defendants'

motion for partial summary judgment as to Plaintiffs' NYLL claims against Shen, Jiang and Zhao is therefore also denied.

### c. Sham issues of fact

Defendants argue that Plaintiffs make multiple contradictory statements in their depositions, affidavits, and responses to interrogatories and requests for admissions. (Def. Mem. 5, 7, 8, 13, 15; Def. Reply Mem. 1–5.) In particular, Defendants repeatedly highlight the affidavit of Dan Shi, submitted in support of the motion for summary judgment, arguing that it contradicts prior statements of fact in the record and is thus untrustworthy. (Def. Reply Mem. 2–4.) Defendants submit that Shi's additional allegations which "directly contradict, without explanation" earlier statements made by Plaintiffs are insufficient to create a genuine issue of material fact and should not be used to defeat the motion for partial summary judgment. (Def. Reply Mem. 5.)

While a Court may make credibility determinations or otherwise find that a party has submitted "sham evidence" in order to create a genuine issue of material fact in opposition to a motion for summary judgment, it may only do so "in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete," such that "it will be impossible for a district court to determine whether the jury could reasonably find for the plaintiff, and thus whether there are any genuine issues of material fact, without making some assessment of the plaintiff's account." *Simcoe v. Gray*, 577 F. App'x 38, 40–41 (2d Cir. 2014) (citing *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005)). District courts should not "engage in searching, skeptical analyses of parties' testimony in opposition to summary judgment." *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 (2d Cir. 2014) (citing *Rojas v. Roman Catholic Diocese of Rochester,* 660 F.3d 98, 106 (2d Cir. 2011));

*see Matheson v. Kitchen*, 515 F. App'x 21, 24 (2d Cir. 2013) (holding that the district court erred when it excluded testimony, noting that "[w]hile some of the inconsistencies identified by the court below might well lead a jury to reject the credibility of [the] testimony, they do not place this case among the 'extraordinary cases, where the facts alleged are so contradictory that doubt is cast upon their plausibility'").  The court may also take into account the timing of the supposedly contradictory testimony in deciding whether to assess the credibility of a witness' account on a motion for summary judgment.  *See In re Fosamax Prods. Liab. Litig.*, 707 F.3d 189, 195 (2d Cir. 2013) ("The timing of the testimony recanting the prior sworn testimony clearly increased the likelihood that it was intended solely to defeat the motion for summary judgment.") (citations omitted), *cert. denied sub nom.*, *Secrest v. Merck, Sharp & Dohme Corp.*, 569 U.S. ---, 133 S. Ct. 2783 (2013).

Similarly, under the "sham affidavit" rule, "factual allegations that might otherwise defeat a motion for summary judgment will not be permitted to do so when they are made for the first time in the plaintiff's affidavit opposing summary judgment and that affidavit contradicts [the plaintiff's] own prior deposition testimony."  *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001).  This principle "does not apply, however, if the statements 'are not actually contradictory,' or 'the later sworn assertion addresses an issue that was not thoroughly or clearly explored.'"  *In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*, 758 F.3d 202, 213 (2d Cir. 2014) (alteration omitted) (quoting *Palazzo ex rel. Delmage v. Corio*, 232 F.3d 38, 43 (2d Cir. 2000)); *see also Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 104 (2d Cir. 2010) ("If, however, the allegations in the affidavit, rather than contradicting, explain or amplify prior deposition testimony, then the affidavit may create a genuine issue of material fact sufficient to defeat summary judgment."); *LeBlanc v. United Parcel Serv.*, No. 11-CV-6983, 2014 WL

1407706, at *9 (S.D.N.Y. Apr. 11, 2014) (noting that "[s]ome courts have suggested . . . that [the sham affidavit rule] will not bar an affidavit when 'an issue was not fully explored in the deposition, or the deponent's responses were ambiguous.'" (alteration omitted) (quoting *Giliani v. GNOC Corp.*, No. 04-CV-2935, 2006 WL 1120602, at *3 (E.D.N.Y. Apr. 26, 2006))).

Defendants have highlighted several potentially inconsistent statements, many of which are not directly contradictory with prior testimony and may be explained when read in context with the record as a whole, or may have another plausible explanation, such as the witness' lapse in memory. It is not the Court's province to "engage in searching, skeptical analyses of parties' testimony in opposition to summary judgment." *Rivera*, 743 F.3d at 20 (citing *Rojas,* 660 F.3d at 106); *Matheson*, 515 F. App'x at 24 (holding that it was error to disregard testimony when, although there were "variations in the details of his account, the substance of [the] testimony cannot fairly be characterized as fundamentally inconsistent or incoherent"). Furthermore, Defendants pick and choose which portions of the allegedly contradictory testimony they ask the Court to reject, sometimes seeking to ignore lines of depositions which conflict with earlier written discovery responses, and sometimes seeking to ignore discovery responses which conflict with later deposition testimony. The majority of the alleged contradictory statements identified by Defendants were made prior to the motion for summary judgment, were not directly contradictory, and, at best, appear to be ambiguous, vague, or capable of multiple explanations. As explained below, the Court declines to disregard Plaintiffs' statements in *toto*, or otherwise make a determination as to the general credibility of the witnesses.

### i. Zheng's power over employees

Defendants argue that Plaintiffs, particularly Shi, contradict each other and themselves regarding Zheng's status as an employer. During discovery, Shi stated that only Shao fired

persons, including Da Bing, Mimi, Xiao Ming, and a fourth person. (Shi First Interrog. Resp. ¶ 6(b); Shi Dep. 78:20–79:6 (stating that *Jiang and Shen* never "actually fired anybody [and t]he only person who had fired anybody was Shao Dong Chu").) In his affidavit in opposition to the motion for summary judgment, Shi stated that "Zheng fired employees, namely those of the lawsuit commenced in 2010."[12] (Shi Aff. ¶ 37.) Defendants argue that these statements are contradictory. (Def. Reply Mem. 2–3.) Defendants also argue that Shi contradicts himself on whether or not he considers Zheng a "boss" or his "boss." (Def. Reply Mem. 4.) Defendants further argue that Shi stated in his deposition that he never took vacation, but stated in his affidavit that he asked Zheng for time off, which she granted. (Def. Reply Mem. 4.)

Defendants do little more than cherry-pick statements out of unclear testimony from Shi. A review of the testimony makes it clear that Shi understood that Zheng had some control over who would be fired, despite the fact that Shi only witnessed Shao communicating termination decisions to employees. (Shi Dep. 119:12–120:4 ("I only say that Mr. Shao was the one who tells who will be fired, but from what I saw, Amy had a lot of power. They consulted each other and made a decision. Therefore, I cannot tell you who had actually hired or fired somebody.").) In fact, Plaintiffs and Defendants agree that Shao *announced* terminations, and other final decisions regarding employment matters. (Def. 56.1 ¶¶ 13, 19, 24; Pl. Counter 56.1 ¶¶ 13, 19, 24.) Even assuming the Court were to disregard the portions of Shi's affidavit that allegedly contradicts his earlier testimony, *see Brown*, 257 F.3d at 252 (a court will disregard factual

---

[12] It is not clear from the testimony whether the Da Bing, Mimi, Xiao Ming, and fourth person referenced in Shi's initial response to Defendants' interrogatories are the same employees referenced in his later affidavit; the issue has not been fully explored in the record before the Court. *See LeBlanc*, 2014 WL 1407706 at *9 (the sham affidavit rule "will not bar an affidavit when 'an issue was not fully explored in the deposition, or the deponent[']s responses were ambiguous.'" (alteration in original) (quoting *Giliani v. GNOC Corp.*, No. 04-CV-2935, 2006 WL 1120602, at *3 (E.D.N.Y. Apr. 26, 2006))).

allegations made *for the first time* in a plaintiff's affidavit opposing summary judgment if the affidavit contradicts earlier testimony), there is evidence presented by Li and Wang which creates a genuine issue of material fact as to whether Zheng could and did fire anyone.[13]  (*See, e.g.*, Pl. First. Interrog. Resp. ¶ 6(b) (response signed by Li and Wang stating that "Amy Chu . . . fired Ghang and Mimi"); Pl. Second Interrog. Resp. ¶ 7 ("Amy Chu fired many employees who worked there: Zhang,[14] Mimi, and Dabing.").)  Given that Li and Wang may have different information than Shi, and given that they have consistently stated their knowledge that Zheng fired at least some individuals, disregarding the alleged contradictory portion of Shi's testimony does not change the outcome of this Court's decision as to Zheng.

As to whether Shi considered Zheng his "boss," the words "boss," "owner" and "shareholder" are confusingly used as synonyms in the portion of the deposition to which Defendants refer.[15]  (*See* Shi Dep. 71:24–72:13, 99:16–24, 129:17–19.)  Because of this, the Court declines to entertain the supposed "contradiction" that arose when Shi failed to state that Zheng was a "boss" in addition to the three shareholders.  Similarly, as to the fact that Shi stated

---

[13]  Admittedly, Li once said she did not know who specifically fired the individual employees fired from the Restaurant.  (Def. 56.1 ¶ 17; Pl. Counter 56.1 ¶ 17; Li Dep. 31:10–31:17.)  This does not necessarily, however, negate her knowledge as to certain employees who were fired by Zheng.

[14]  It is unclear from the record to what extent the employees listed in Plaintiffs' first interrogatory answer overlap with the employees listed in Plaintiffs' second interrogatory answer.  Given that the pleadings thus far have revealed multiple names for a single person — Amy Chu a/k/a Yi Zheng being one of them — or multiple permutations of a single name  — Shao Dong Chu, Shao Dong Shu, and Dong Shu Shao all being used to refer to Defendant Shao — the Court declines to question the consistency or inconsistency of these statements.

[15]  The Court notes that the depositions were conducted through translators, and at times confusion seemed to result from an issue with translation.  In reading the deposition testimony, the Court is mindful of its obligation to draw all reasonable inferences in favor of the non-moving party.  *See Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

he took no "vacation" in his deposition, (Shi Dep. 82:3–21), the Court finds no direct contradiction with Shi's statement in his affidavit that he, on three occasions, asked Zheng for a day off, (Shi Aff. ¶ 15). It is plausible to believe, drawing all inferences in the light most favorable to Plaintiffs, that not every day off is a vacation, and that there is some explanation, such as a sick day or a day off to attend to personal matters, to explain why the days off requested by Shi were not "vacation."

### ii. Jiang and Shen's power to hire and fire

Plaintiffs apparently contradict their original admission provided to Defendants during discovery, in one instance. In paragraph twenty eight of their response to Defendants' request for admissions, Plaintiffs "[a]dmit that only Dong Chu Shao hired *or* fired employees, set wages, set terms and conditions of employment, *or* maintained employment records." (Pl. RFA Resp. ¶ 28) (emphasis added). In response to similar language presented in Defendants' Rule 56.1 Statement, Plaintiffs state they "[h]ave no knowledge of the statements of Defendants' paragraph 23." (Pl. Counter 56.1 ¶ 23.) These two responses, viewed in isolation, contradict each other, and it appears from the timing of the latter statement that it was made for the purposes of defeating Defendants' motion for partial summary judgment. *See In re Fosamax Products*, 707 F.3d at 195 ("The timing of the testimony recanting the prior sworn testimony clearly increased the likelihood that it was intended solely to defeat the motion for summary judgment.") (citations omitted). As an initial matter, Plaintiffs' Counter Rule 56.1 statement was signed only by counsel, and is not sworn testimony. Second, as discussed above, the word "fire" is sometimes used to mean "communicated a termination decision" and sometimes used to mean "had input in a termination decision." The Court will not, in deciding summary judgment, attempt to establish

which meaning each party intended at each instance.[16] Finally, even if the Court were to ignore Plaintiffs' response to paragraph twenty three of the Rule 56.1 statement, the record is otherwise rife with references to Plaintiffs' respective assertions that Jiang, Shen and Zhang also *had the power* to hire and fire employees (even if it is unclear whether that power was exercised), that Zheng did fire employees, and that all three had some power to determine conditions of employment. The Court does not rely on the Rule 56.1 statement alone in concluding that there is a genuine issue of material fact as to whether Jiang, Shen, or Zheng qualifies as an employer under the FLSA or NYLL.

### iii.    Jiang and Shen's decision-making authority

Defendants have combed through Plaintiffs' deposition testimony to list a series of "inconsistencies" regarding decision-making authority for the Restaurant. (Def. Mem. 3.) Defendants point to several instances where Plaintiffs could not recall, in their depositions, which putative employer specifically made certain decisions for the Restaurant. (Def. Mem. 3–4.) Defendants highlight that Shi, in particular, made some purportedly inconsistent statements throughout discovery. For example, Shi stated in his deposition testimony that he believes all shareholders determined pay and otherwise discuss "many things" at shareholder meetings, but acknowledged that he has no firsthand knowledge of the meetings. (Shi Dep. 62:20–63:24, 70:2–21, 117:24–118:5.) Shi also stated in his deposition that he did not know which of the shareholders specifically made decisions about hours or working conditions, (Shi

---

[16]    Furthermore, the Court recognizes that the word "or," as implemented in Defendants' request for admissions, is sometimes used exclusively and sometimes used inclusively, and it is plausible that Plaintiffs interpreted the request for admission to use one form of the word, and Defendants intended it to mean the other. In light of the Second Circuit's directive not to "engage in searching, skeptical analyses of parties' testimony in opposition to summary judgment," *see Rivera*, 743 F.3d at 20, the Court refuses to parse out all plausible explanations — grammatical or factual — and will leave determinations of credibility to the jury.

Dep. 120:5–121:17), but noted that Jiang made the announcement regarding "overseers" or supervisors of the wait staff and kitchen staff, (Shi Dep. 75:21–76:25, 141:12–144:21). Defendants point to Shi's response to their first set of interrogatories, which acknowledges that Shao is the owner of the restaurant and "he determined salary, fired persons, and made final decisions and announcements." (Shi First Interrog. Resp. ¶ 6(a).) Shi's statements about his personal beliefs, acknowledgement of his lack of personal knowledge, and acknowledgement that Shao was at least one of the people making decisions in the Restaurant, do not appear to be contradictory, and are not sufficient to "place this case among the 'extraordinary cases, where the facts alleged are so contradictory that doubt is cast upon their plausibility.'" *See Matheson*, 515 F. App'x at 24. Furthermore, to the extent Shi admitted in his deposition that he has no personal knowledge of a fact, such as what is discussed at shareholder meetings, the Court has disregarded his suppositions.[17] *See DiStiso*, 691 F.3d at 230 (noting that affidavits or deposition testimony must be based on personal knowledge).

In arguing that Plaintiffs' affidavits in opposition to the summary judgment motion should be disregarded, Defendants rely heavily on Plaintiffs' May 22, 2013 response to Defendants' request for admissions, in which Plaintiffs are asked to "[a]dmit that only Dong Chu Shao hired or fired employees, set wages, set terms and conditions of employment, or maintained employment records."[18] (Pl. RFA Resp. ¶ 28; Def. Reply Mem. 1.) Defendants argue that this

---

[17] The Court has also disregarded similar conclusions posited by Defendants in their affidavits, including Shao's assumption that Shen and Jiang did not threaten to fire anyone, based on his belief that if either of them had done so, his employees would have informed him of the threat. (Shao Decl. ¶ 16.)

[18] Defendants repeatedly cite to paragraph twenty seven of Plaintiffs' response to this request for admission, in which Plaintiffs are asked to "[a]dmit that Defendant Restaurant never fired any employees," which Plaintiffs denied. (Pl. RFA Resp. ¶ 27.) Defendants include the

admission, combined with Shi's admission that only Shao hired or fired Restaurant employees,

(Shi First Interrog. Resp. ¶ 6(b); Shi Dep. 78:25–79:6), should prevent Plaintiffs from arguing

that Jiang, Shen or Zheng had the power to hire or fire employees. Defendants also point out that

Shi has stated on multiple occasions that he has witnessed both Jiang and Shen *threaten* to fire

others. (Shi Supp. Resp. ¶ 6(b); Shi Dep. 80:3–16.) Defendants argue that this "directly

contradicts" Shi's deposition testimony that he did not know who made decisions about work

hours and working conditions, (*see* Shi Dep. 119:7–120:12; 120:5–121:17). (Def. Mem. 7–8.)

As a preliminary matter, Plaintiffs' Counter 56.1 statement denying knowledge as to whether

only Shao had responsibility in the Restaurant, can be attributed to the possibility that Wang and

Li, who did not join Shi's response to the first set of interrogatories, had a different

understanding of who hired or fired Restaurant employees, or made other employment decisions.

Second, Shi's alleged "contradiction" of his own testimony is not entirely contradictory, and was

sworn testimony given prior to the filing of this motion for summary judgment. *See In re*

*Fosamax Prods. Liab. Litig.*, 707 F.3d at 195 (contrasting depositions with affidavits submitted

after summary judgment motions were filed) (citations omitted). The apparent inconsistencies

about who fired whom and who had the authority to set terms and conditions of employment are

not properly resolved at this stage of the litigation.

---

same error in their statement of undisputed facts, pursuant to Local Rule 56.1. (Def. 56.1 ¶ 23.)
In their Rule 56.1 statement, Defendants cite paragraph 27 for the proposition that "[o]nly Shao
hired or fired employees, set wages, set terms and conditions of employment, or maintained
employment records." (*Id.*) The Court assumes Defendants' repeated references to paragraph
twenty seven are the result of a typographical error, and, based on the surrounding arguments,
concludes that Defendants intended to refer to paragraph twenty eight instead.

### iv.   Jiang and Shen's direct control over employees

According to Shi's affidavit, Jiang appointed "overseers" and prepared duty schedules for the kitchen staff.  (Shi Aff. ¶¶ 27–29, 34–35.)  Shi's deposition testimony indicates that Jiang made the announcement regarding "overseers" or supervisors of the wait staff and kitchen staff. (Shi Dep. 75:21–76:26, 132:23–133:23, 141:21–144:21).  Defendants note that Shi did not mention the duty schedule in his deposition, despite the fact that he was asked if he stated every reason he believed Jiang was his boss.  (Shi Dep. 116:2–7.)  Defendants argue that the attempt by Shi and his counsel to clarify that Jiang made the announcement, though Shi was not certain as to who made the decision, is inconsistent with Shi's assertion that Jiang had control over who was appointed overseer.  (Def. Reply Mem. 3.)  As discussed above, the Court is not persuaded by Defendants' arguments.

Defendants also argue that Shi makes conflicting allegations with respect to whether or not Shen ordered wait staff to collect sales tax on all orders, or to waive it.  (Def. Reply Mem. 3; *see* Shi First Resp. ¶ 6(b); Shi Supp. Resp. ¶ 6(b); Shi Dep. 26:19–27:20.)  Defendants further argue that Shi stated in his deposition that he was unaware of all of the records kept by the POS system, (Shi Dep. 109:3–109:15, 110:4–9, 111:3–5), but later said in his affidavit that Shen reviewed the POS to ensure that waiters always included sales tax, and would chastise the waiters if they had not, (Shi Aff. ¶ 19).  These statements are not directly contradictory.  It is plausible that Shi was given different instructions at different times, and plausible that Shi believed Shen was able to monitor the sales tax through the computer but unaware of what other records were kept.

Defendants nitpicking has not elucidated any evidence that is so "contradictory and incomplete" that it would be "impossible" for the Court, without assessing Plaintiffs' credibility,

to determine whether a jury could reasonably find for Plaintiffs.  *See Simcoe*, 577 F. App'x at

40–41.  The Court acknowledges that Defendants have identified apparent gaps and

inconsistencies in Plaintiff's testimony, but "it is by no means wholly conclusory, contradictory,

or incomplete."  *See Barrows v. Seneca Foods Corp.*, 512 F. App'x 115, 119 (2d Cir. 2013) ("It

very well may be that a jury will ultimately decline to believe the plaintiff's story, but it is not for

us to interfere with the special province of the jury to 'assess[ ] . . . a witness's credibility.'"

(alteration in original) (quoting *Fincher v. Depository Trust & Clearing Corp.,* 604 F.3d 712,

725 (2d Cir. 2010)).  Upon review of the apparent inconsistencies, the Court has determined that

the majority of Plaintiff's statements are not directly contradictory, and that most either elaborate

upon or explain earlier testimony, or appear to be the result of poor questioning or

misunderstanding.  *Rojas*, 660 F.3d at 106 ("[I]f there is a plausible explanation for discrepancies

in a party's testimony, the court considering a summary judgment motion should not disregard

the later testimony because an earlier account was ambiguous, confusing, or simply incomplete."

(quoting *Jeffreys*, 426 F.3d at 555 n. 2)).  Otherwise, the record as presented is, at most,

confusing and muddled with translation issues.  Distinctions as to what is or is not credible

would involve the kind of searching inquiry that the Second Circuit has cautioned against.

*Rivera*, 743 F.3d at 20.

As discussed above, the facts alleged here are not "so contradictory that doubt is cast upon their plausibility." *See Rojas*, 660 F.3d at 106; *Matheson*, 515 F. App'x at 24. Thus, the Court declines to reach credibility determinations at this time.

**III. Conclusion**

For the foregoing reasons, the Court denies Defendants' motion for partial summary judgment.

SO ORDERED:

_____
s/ MKB
MARGO K. BRODIE
United States District Judge

Dated: January 29, 2015
          Brooklyn, New York